We'll hear argument first today in Case 11-982, AllReady, LLC, DBA-Yums v. Nike. Mr. Dabney. Mr. Chief Justice, and may it please the Court, the Article III question in this case turns on resolution of two issues. First, whether loss of freedom to operate on the part of a direct competitor qualifies as Article III injury in fact. And second, what party bears the burden of proof of facts that are contended by it to render a claim moot? The counterclaim in this case seeks to extinguish a source of cost, risk, and official restraint on what footwear products the petitioner can and cannot legally sell. These are classic forms of injury in fact. On the burden of proof point, the proponent of a factual contention always bears the burden of proof. And this is especially true when the question arises in the context of a claim that a voluntary act has allegedly ousted a Federal court of jurisdiction. Moot in this doctrine protects a party seeking relief from the kind of evasive maneuvering that's happened in this case. Kennedy. If I were to write an opinion indicating that there's a chill here because distributors and retailers will see that there's been this suit against your client and they would be reluctant to distribute, would there be, would I just make that up or is there something I can read to find out, find that out or? Injury in fact is a question of fact. And injury in fact is based on evidence. Well, the evidence here was that they did need investors and investors were reluctant. That's correct. It wasn't specific evidence. Was there anything besides that? There are three forms of injury in this case. The first is that the Petitioner's cost of operation is increased because the disputed claim was not expunged. When the Petitioner designs and sells new products, it has to go through an incredibly costly process to determine whether or not its next line of shoes might give rise to a plausible claim. Okay. Is that in the record? It certainly is. The Petitioner says through its President on page 173 of the Joint Appendix that he's engaged in new, development of new shoe lines which by definition are outside the scope of the covenant. Well, but I mean, you said it's incredibly costly to do this and so forth. Is that in the record? That specific statement is not in the record. I mean, it makes sense, but I'm a little reluctant to take judicial notice of the shoe business. Your Honor, I'm glad you brought that up because under the mootness doctrine, the burden of proof on that and every other fact relevant to mootness fell on the Respondent. Under this Court's precedence, the Respondent in this case, in order to oust the district court of jurisdiction, had to show two things to a high degree of probability. The first thing the Respondent had to show is that it was absolutely clear that the Petitioner could not reasonably be expected to do that. Breyer, you're right. That's the standard. And so you said that, I mean, I feel perhaps more calmly about this than you might feel is warranted, but the question is, is there anything here that you're so you said by definition we're going to produce some new shoes which new shoes are not, do not have the appearance of any current and or previous footwear product designs and any colorable imitations thereof? So I would like you to refer me to the record where your President of your client or somebody else says we are intending to produce some new shoes that fall outside that definition. And, of course, I will look at that, because your opponent says we can find no reasonable likelihood that they are going to produce anything or they have any present intent of showing, of producing something that falls outside that definition. But now you just said, oh, no, we're definitely going to, so just refer me to those pages in the record that shows that, because, of course, you win if that's true. Page 173A of the record of the Joint Appendix states that the Petitioner is intending to produce a design of new footwear. Yes, but that isn't the point. The point is, is the new footwear that you are designing footwear that is not, does not have the appearance of any current or previous footwear product designs or any colorable imitation thereof? And so to say you are in the business of producing new footwear, at least to me, suggests nothing, because the question is what the new footwear looks like, not that you are producing new footwear. Your Honor, in the real world, a business competitor. No, I'm not interested in the real world. I am interested in the record. The record does not show that the Petitioner lacks any concrete interest in entering the line of commerce. And does it show anything at all in respect that would support the claim that you are going to produce new footwear that does neither resembles nor is a colorable imitation of anything that you have previously produced or is the subject of the case? Your Honor, the what the record shows, and it is what it is, is that the Petitioner is actively engaged in designing and bringing out new footwear products. Period. Breyer, so I take it that this case really boils down to, should you have, should they have, or you both have, another chance to say what the new footwear will be looked like under a new standard, or is there enough here already to say, well, really the judges could conclude that there is no real likelihood that you are going to produce something that won't look like what's already been produced? We would respectfully submit that when you apply the mootness doctrine, since we are not talking about picking a fight here, we are talking about someone who was sued once, once bitten, twice shot, that when someone has been sued for alleged infringement has asked for a judgment that would eliminate any need to think about whether or not a new shoe will attract. I assume that was your point, that you shouldn't be put through the trouble of figuring out whether the new shoes that you produce are close enough to the old one to be covered or are not. You're at risk, right? Exactly. And I would think that you would add this as well, that for a competitor to demand that the other competitor tell its plans, its marketing, is to say the least patronizing and probably quite injurious in and of itself. That would itself be an injury. Again, do I just know that because I'm a judge, or is there some place I can look for that? The law is that as I stand here today, the government has registered a claim that the Petitioner is duty-bound not to bring out the shoe shown in the registration, number one, which according to the Respondent is one of the best-selling, most profitable shoe styles of all time. And also, as I stand here today, the law is that Petitioner is at risk if it brings out a shoe that is going to be giving rise to a plausible claim, whether the office does this or not. Mr. Dabney, are you saying that this device of the unilateral covenant is no good unless it says that you will never be sued for any shoe that you ever produce? Are you saying that the covenant is no good or that this covenant is deficient? I'm saying that the Respondent bore the burden of proving that the covenant completely and irrevocably eradicated all of that. So if you are uneasy about the covenant as it exists, why didn't you say, Judge, this covenant doesn't give us adequate protection, it should be amended, and then say what you think you need to be adequately covered? Because the Petitioner asks for judgment in accordance with law and would prefer not to be the involuntary licensee of the Respondent that sued. Sotomayor, well, does that mean that if they gave you a covenant that said, vis-à-vis your company, our trademark, the form of this shoe, is invalid, we won't sue you for anything, either an exact duplicate or any colorable imitation thereof with respect to this design, would that be enough for you? Your Honor, again, I'm not saying that. I'm saying that if they gave you a covenant that said, vis-à-vis your company, our trademark, the form of this shoe, is invalid, either an exact duplicate or any colorable imitation thereof with respect to this design, would that be enough for you? I'm not saying that if they So you're saying that in this case, there's no way, I mean, I thought it was a practice that was not unprecedented for parties to grant covenants of this sort. You're saying this is unheard of? Nobody can do this? The practice in this case dates to 1995. This is a totally recent, controversial practice that has never been embraced by this Court at all. In fact, it was articulated in a case two years after McCartney's penalty. Well, that's not the question, Mr. Dabney. The question is, is there any covenant that exists in the world that would make you feel secure? And I suppose I'm having a little bit of difficulty with the answer, with an answer that says, no, there's no covenant that you can write that would make us feel secure. The reason is, Your Honor, that the registration causes informational injury, and what the Respondent is trying to do is to hang on to government action that disadvantages its competitor. But I don't know why my solution was that they would give you a covenant that I suggested as a possibility that would say, vis-à-vis you, you can imitate, counterfeit, use this design, only vis-à-vis you. Why doesn't that protect you fully? Because what they're saying to you is, copy the design if you want, so long as you're not using another trademark. But that's not the issue. The issue is whether you're infringing this design. The question that trademark practitioners get asked every day is whether something is available. And so long as that question is asked, a covenant that's in the file of a company is not going to prevent deception and confusion of people who look and say, oh, this is a protected design. Mr. Dabney, that's a different answer than the one you gave me when I asked the same question. You said, because we don't want to be an involuntary licensee of Nike. That is a second form of injury that we have now, as Justice Scalia pointed out. Right now, we cannot just ignore the claim and bring out either this YUMS version of a. . . Can you just explain to me, you've given a name to this carte blanche that Nike would give you. What is the significance of your being an involuntary licensee? It's not something that you wear as a brand. I mean. What we've substituted is instead of getting a judgment in accordance with law that expunges the allegedly invalid government-registered claim of right to exclude competition in the sale of goods, in favor of the chance to litigate with our archrival to see whether they will approve. Then you're going back to saying the covenant, no covenant, is any good. A covenant that leaves the covenantor in possession of the unreviewed government benefit that it's not. Yes, but that's. Look. I mean, maybe you can suggest to me that I we should change what the law has been or not follow it here, but where I'm taking the law from is Friends of the Earth. Yes. And in Friends of the Earth, it says a defendant, namely Nike, claiming its voluntary compliance moots a case, and what they're claiming is that this covenant moots the case, moots the case, the covenant they gave. Bears the formidable burden. Now, that's formidable. You're quite right. Of showing it is absolutely clear, correct, that the allegedly wrongful behavior, namely their suing, but their suing in respect to this kind of shoe, could not reasonably be expected to recur. And they say since we've promised, in an enforceable promise, not to repeat this behavior ever, 100 years, how could it be expected reasonably to recur? How could our behavior, namely suing for infringement in respect to a shoe like this, be reasonably expected to recur, given our covenant? And your response to that is? The claim the counterclaim seeks to extinguish is not simply the particular rights of action that they have covenanted not to assert. The claim that is sought to be extinguished is the much broader government registered claim of right to exclude competition in the sale of shoes that embody that design. Mr. Dabney, if you had the various interests that you're asserting now, we're not talking about mootness, but we're talking about Article III standing. I'm looking at what you're alleging, that you have plans to introduce particular shoes. People are considering investing in your company. Your opponent has intimidated retailers. If you brought a suit by yourself, is that sufficient to establish Article III standings? Are those the sort of concrete and tangible injuries that we've required? I would say we have very distinct and concrete and palpable injuries. Just because you plan to introduce a particular line of shoes, you can bring a lawsuit. No. Okay. Just because people are considering investing. Somebody who came in and said I've got this company, people are thinking of investing in it, and therefore you want to proceed with your lawsuit. It is undeniable by law that the Petitioner's cost of operation, the Petitioner's risk of operation is increased. Well, now, that surely would not establish Article III standings. Everybody's cost of operation is increased whenever there's any trademark at all, because you have to check and see whether it violates a trademark. Yes, but we're a direct competitor, which we say is currently subject to an unlawful restraint on our freedom of operation. Mr. Dabney, suppose there had been no infringement claim. Could you have, but you're in the shoe business and you're worried, could you have brought a declaratory action or an action for an injunction to have the trademark declared invalid? When our shoes were launched, it obviously never even occurred to the Petitioner that they could be deemed an infringement of any rights of this Respondent. So the answer is we were not injured at that point. But now that we've been sued once bitten twice shy, we now have been told by the Respondent that it claims a far-reaching claim of right to exclude competition in the sale of goods. So you say you could not have brought a suit to cancel. The three-part test of injury in fact is universally applicable. So we did not allege, and I don't believe we had injury in fact, when our shoes were launched. So, no, of course there would not have been a suit that we could have brought at that time. But since we're in a mootness case and we've been sued and we've been told and have all these defamatory allegations about and dragged our company's name through the mud, the situation is different, as Your Honor has said. But if that's the case, if the difference is that you've been sued, then it should be adequate protection if you know that you won't be sued again. And that's why there's the question of what kind of covenant would give you adequate protection that you won't be sued again. If the, as I said before, if the only injury we were complaining about and trying to extinguish was the injury that flows from being sued again by this Respondent, then I suppose you could conceive of a covenant that would extinguish that injury. But in trademark registration practice, it has been routinely heard by Federal courts. We cite two on page 8 of our reply brief. But the kind of injury that Petitioner is complaining about in this case has been heard and adjudicated by Federal courts for decades. We cite two cases 85 years apart. It has never been done. Ginsburg. You, Mr. Dabney, you told me you could not bring such an independent suit. You have to be stung once. So you can bring it as a counterclaim, as you did here, once there's an infringement suit, but you did say that you could not just walk into court and say I want an injunction  Well, let me clarify. The Petitioner totally agrees there has to be injury in fact, in all cases. And so my answer to your question and this hypothetical question is we would have to allege adequate injury. And the Chief Justice suggested that increased cost of capital might or might not qualify for injury in the initial standing case. No, I suggested it might not. Might not, that's right. So we have increased cost of capital, increased cost of design, and of course, we have the legal burden and duty to refrain from making shoes now that would give rise to a plausible claim on the part of the Respondent. If there are no further questions, I would like to reserve the rest of my time. Thank you, counsel. Ms. Anders. Mr. Chief Justice, and may it please the Court. A trademark holder can moot a declaratory judgment action seeking to invalidate a trademark by offering the plaintiff a sufficiently broad covenant not to sue. Whether the covenant eliminates the controversy between the parties should be analyzed under the Voluntary Cessation Doctrine. The analysis that the government is proposing is both a way of determining whether the covenant has eliminated any concrete dispute between the parties, and also a framework for the parties to use to negotiate the appropriate scope. Sotomayor, Ms. Anders, what there is a question about why a competitor should have to produce to its competition its future plans of development. I mean, the marketplace, especially in fashion, importantly likes to keep quiet what it's doing because it doesn't want other imitators to beat it to the punch. So given that interest, why isn't their claim that they're being inhibited because of the requirement to produce their products or their intended products enough to establish injury in this case? Well, once the defendant offers the covenant, then the question becomes whether there is anything that the plaintiff is intending to do, its current activities or its concrete plans for anticipated activities that would fall outside the covenant and potentially be infringing, because if those activities exist, then the covenant has not. Kennedy, but could we say that there's just a presumption that if you're in the business that you probably are interested in future design, period? I don't think that presumption would establish a concrete interest. The question here is whether it would not establish that the plaintiff has a concrete interest. The question is whether the dispute between the parties is reasonably likely to recur, and if the plaintiff cannot point to anything that it's currently doing or that it's planning to do. I read its affidavit as saying, we're in the shoe industry. We're going to make new shoes regularly. We want to copy their shoe. We don't think it's protected by trademark. We want to copy it. They don't say, and that's something on rebuttal that maybe a Petitioner will explain, that we want to copy it exactly. But what they're saying is we want to copy it because it's a free form. That's really what I read their affidavit as saying. So if why do they have to actually, do they have to produce their design to prove they're doing that? I think what they have to do is they have to state that they intend to make products that may be outside the covenant. Sotomayor But saying it is enough? That's what I thought their affidavit said, and I thought the court below said, no, you've got to show us the product. I think their affidavit says that they intend to produce new shoes as a general matter. It doesn't tell us what those shoes may be, whether they, it doesn't give us a way of knowing whether they might fall outside the covenant. And I think I would. Sotomayor Now, go back to my question. Is it enough to just say it, or do they have to produce the designs so that the court and Nike can decide? It is Nike, right? The court and Nike can decide whether the shoe is a colorable imitation or an exact copy. I think that could depend on the breadth of the covenant. I think in some cases, for instance, if the covenant doesn't cover any future products, it may be enough for the plaintiff to credibly allege, we intend to make future products that aren't covered. Sotomayor I agree with you wholeheartedly. So I also think that it may depend, the less far along a party's plans are to make its shoes, the easier it will be for the defendant to say, it is speculative that your plans will actually mature into something that doesn't. Kagan So, Ms. Anders, take this case where already says, you know, we're not really going to say anything particular. We're just going to say that we're in the business of making shoes, and we might make a shoe. Would that, that would not be enough under your standard. Is that correct? Anders I think that's right. I think if the parties went back on remand in this case, and we do think there should be a remand here, but if the parties went back and we had the exact same facts, and Nike said that anything that was a colorable imitation of already's shoes was covered by the covenant, and already came back and said, just generally, we're making new shoes, I think in that situation, it would be relatively easy for Nike to show that the possibility that already would be impacted by the covenant, or impacted by the trademark, I'm sorry, would be speculative. Kagan Given what already has said in this case, why is it that you think that we should remand? I mean, it sounds as though we're remanding for no purpose, given what already has said throughout the course of the litigation, and indeed in this Court today. Anders I think there are two reasons. The first is that when this Court establishes a new standard, it often, it traditionally will remand to allow the courts, the lower courts, to apply that standard in the first instance. And the second is that there was some uncertainty about what the covenant meant below. So Nike represented that the covenant covered the existing shoes, and already said in its motion to dismiss briefing that it thought the covenant did not. Kennedy But its future shoes are clearly, and I thought the counsel for the petitioner might have added this in his answer to Justice Sotomayor, that its future shoes are not covered by this. And if Nike has a heavy burden of proof, can it have discovery and take depositions on what their plans are, what their marketing plans are, what designs they're thinking about? Anders I think that would be one way for Nike to try to establish that, that the dispute is not reasonably likely to recur. It could get discovery into. Kennedy So then, so then the covenant not to sue gives Nike an advantage that no other manufacturer has. Anders I don't think it does give the Nike an advantage. Kennedy Do you mean any manufacturer without, without any litigation can, can ask already, well, tell us your plans. What shoes are you thinking about? Anders Well, once already produces, once already identifies what its future activities may be, and again, it doesn't. Kennedy Why should already have to do that to anybody? Anders Well, we think it makes sense for already to have to, to have to at least identify here what activities it thinks may not be outside the covenant. And I don't think that hurts already. And the reason is that if, if already's evidence convinces the court that the case isn't moot, then already gets its adjudication. Kennedy So Nike has an advantage over already that no other manufacturer has had. It can demand what its future plans are. Anders Well, it will get its, the trademark will be, will be adjudicated if Nike, if already convinces the court that the action isn't moot. Kennedy Let me just ask you one, one question on that, and it's a little bit off of what we've been talking about. You say in your brief, well, now, now, don't worry, what you can do is you can go to the trademark, PTO board, and, and they'll, and they'll adjudicate this, this mark. And so, you know, you can really go out of the courts and go to the administrator. Suppose already goes to the administrative agency and loses. Can it have judicial review? And is there, is, is standing easier to show once there has been an adverse action in the administrative office, or are we right back where we started? So once you go to the agency and you try to appeal, the court says, well, this is an Article III court. We need a case of controversy. And you're right back where we are now? Anders Well, a couple of points on that. The first is that we're not proposing that the court should dismiss discretionarily every action just because the TTAB exists and can adjudicate the proceeding. Breyer That was a big part of your argument. You were telling us, oh, don't worry, you can always go to the patent office. Anders What we're proposing here is that as a function of the court's broader discretion under the Declaratory Judgment Act and United States v. W.T. Grant is that when the court believes that it probably does, does have jurisdiction, but it doesn't think that the likelihood of a dispute is really that great, that in that situation it can discretionarily dismiss. So that would be a situation in which there is an Article III case. Kennedy My question is, is the Article III requirement that already has the same in this case as it would be if they sought judicial review from an adverse order of the administrative agency? Anders The administrative agency standing rules are broader than Article III, so it is easier to go from there. Breyer But you're talking about going to court. Anders And so once it goes to court, there may be rare cases in which already as the party that lost, if it isn't injured in fact by the TTAB's decision itself, that it would not have the necessary Article III injury to seek judicial review. That hasn't, to our knowledge, that has not occurred, but it is possible that that could happen, because 15 U.S.C. 1064 makes the TTAB's standing requirements broader than the Article III. Ginsburg You did say, if I recall correctly, that Congress regarded the PTO as the preferred forum for cancellation proceedings. The statute sets up the PTO proceeding, but it also allows the claim to be brought in court. So what shows that Congress meant these claims to be, to go to the agency in preference to the court? Anders Well, I think Congress didn't set it up as an exhaustion requirement. I don't think it's that Congress preferred for all of these claims to go to the TTAB. But the TTAB is the expert body that adjudicates cancellation and validity issues all the time. So we think there could be circumstances in which it would be particularly appropriate for a district court to consider the existence of the TTAB proceeding. For instance, if there's a ready-related proceeding pending before the TTAB or there's a concurrent proceeding, something like that, we think it would make sense for the district court in considering whether to dismiss the action to take that into account. Roberts I thought your answer to Justice Kennedy's question might be that the, an adverse decision from the agency covering you is an additional injury, in fact, that gives you Article III standing, unless the basis for the agency's decision is you don't have any injury. Anders I think there could be some circumstances in which the TTAB's decision would create injury, in fact, if it said something about the scope of the trademark or something like that. So there could be situations in which 1071 would then allow the losing party to get judicial review. Roberts Thank you, counsel. Mr. Goldstein. Goldstein Mr. Chief Justice, thank you very much. May it please the Court, you will want to have available to you the cert petition and the small volume of the joint appendix. In our submission, the Court needs to adopt a rule that has balance to it, and that is it has to be possible to resolve one of these cases through a covenant not to sue of appropriate breadth. But it also has to be the case that a covenant not to sue can't just always eliminate the other side's injury. And so it's going to depend on the covenant and it's going to depend on what the other side says about its plans. And our point in this case is that you should adopt the following rule, and that is if you have a covenant not to sue and it covers everything that the other side alleges an intent to produce, then there is no more injury. If it doesn't cover that, then there may well be injury. And our point. Sotomayor How do you deal with the point that's been discussed with your adversary? They have to show you everything they intend to produce? What entitles you to that showing? Absolutely. So one thing that's very important to recognize, two things about trademark practice. First is that in all of these cases, remember, most of the time the question of trademark or patent invalidity will just be a suit for invalidity. It might be a counterclaim. This happens all the time. And in all of these cases, including this case, there is a protective order. And there is one in this case. And the protective order says that a party can designate its material so that it's lawyer's eyes only, and so that no business person from the other side is entitled to see it. So that, Justice Kennedy, with respect, it's actually not true that this is an unusual situation or that we would get some special advantage. In every single patent or trademark invalidity case after this Court's decision in MedImmune, the party alleging invalidity in order to show its standing has to say we intend to make a product that is regarded as potentially invaluable. Sotomayor. Sotomayor. Sotomayor. Sotomayor.               Sotomayor. Sotomayor. Sotomayor. Sotomayor. Sotomayor. Sotomayor. Sotomayor. Sotomayor. We have the trademark. We think it's invalid. If it isn't validated, for sure we're going to do it, because it's going to mean great sales if we put our name on it rather than your name. Yes. The answer to your question is going to be yes, but it has two parts to it. The first is, because I really want to focus on precisely what you said, you said first, what if they simply say? Now, if they were to simply say it, there could be a factual inquiry into whether they're telling the truth or not. We could debate. We could have a fight about the actual evidence. But let's assume they could prove it, and that is the district judge was told by already or whatever other competitor, we want to make a counterfeit. In that case, unquestionably, unquestionably, there would be a continuing Article III injury, and let's then go to your understanding of what the declaration in this case actually says. So first, let me start with how the case came to you, and that is the court of appeals, what it understood the record and the district court understood the record to be, and that's going to be in the Petition Appendix at page 2.  Well, Mr. Goldstein, how the case came to us, how this case originated, was a counterclaim. And at the time the counterclaim was asserted, there was certainly Article III jurisdiction over the counterclaim, right? Goldstein That's absolutely right, and we accept for present purposes that there is going to be a reduced requirement under the Voluntary Cessation Doctrine. We've briefed why we don't think that's true, but I assume for the purposes of these cases, there is a heightened burden on us to show that the case is over, and we believe that we showed beyond peradventure that we really resolved this case when we didn't just dismiss our claim with prejudice, but we affirmatively granted them a covenant not to sue that covered not only their existing products, but, Justice Kennedy, their future products, and I'm glad to take you to the language of the covenant, because they are the colorable imitations of their current products. Kagan Do you think that this covenant covers an exact copy of your sue? Goldstein It does not. And if the other side had said in the district court, we have an intention, and this is Justice Sotomayor's point, we have an intention, we have a desire to make a copy of your sue, then there would be a case or controversy. And it's an — Kennedy Is the Petitioner's argument, or do you anticipate that the Petitioner will agree with you that this covers future products? Goldstein Yes, because although the cert petition says that it doesn't, we have quite stridently pointed out in our briefing that that was completely inaccurate. And I'll just — let's go to the covenant. I don't think this is really that hard or that controversial. So if we go to the joint appendix at pages 96 to 97, and so — and I remind you that the question presented is exactly what you're saying, Justice Kennedy. I'll read it. You don't have to turn back to the cert petition. And its premise was that the registrant promises not to assert its mark against the party's then-existing commercial activities. So now I'm in the covenant itself on page 97A, and this is what we promised not to sue them about. We've promised not to sue them, and I'm five lines down from the top, on account of any possible cause of action based on or involving trademark infringement, unfair competition or dilution under State or Federal law, based on the appearance of already current, okay, that's not future, or previous footwear product designs, and any colorable imitations. And that's what — that's what — Sotomayor The colorful imitation, colorable imitations, are colorable imitations of their shoe. Goldstein That's exactly right. Sotomayor You haven't promised to not sue them over colorable imitations of your shoe. Goldstein That are not colorable imitations of their shoe. Kennedy Well, but you have two categories. You have current and previous, as to which the covenant runs to everything. Then you have what you say is future, and that has to be a colorable imitation. Goldstein That's exactly right. Kennedy So it does cover some future designs, and they're correct about that, and you're incorrect.  So this is the situation with the covenant. Our covenant not to sue covers everything they've made in the past, everything they were making at the time, and every future product of theirs that is a colorable imitation. Our point is not that it covers every future shoe of theirs. We're on the same page in that respect. You are absolutely right, Justice Kennedy, that there are shoes that they could make in the future that would not be covered by the covenant. There could be an injury about that. And so my point about the record in the case and how the case was developed and how we might have modified the covenant if they had told us anything suggested anything outside the covenant they might want to make, is let's look at what they actually told the district court and the court of appeals about what their intentions were. Ginsburg So it's a question of deficiency in their pleading. Suppose they amended their counterclaim and said, as soon as we are able, we want to do a counterclaim. Goldstein Yes.  It's a deficiency in the proof. So my point about this, it's very important for the court to understand that this case was not dismissed just on the pleadings. It wasn't just an insufficiency in their allegation, and they said, well, actually we have more that we want to say, because we actually can explain to the courts that we want to make other shoes. The case was decided on a fully developed record. We moved to dismiss. They submitted five declarations in response that described their intentions precisely. Kagan Suppose in a different hypothetical case, they had said, what we want to do is to copy Nike's shoe. Goldstein Yes. Kagan What then should have happened, in your view? Goldstein Okay. So I do — I would love to return to what actually happened, but in that hypothetical, what would happen is that our motion to dismiss would be denied unless and until we could prove that what they were saying wasn't true, because it is absolutely the case, and it is a strong point in our favor, that you can't evade an attempt to invalidate your trademark through a covenant not to sue, because you can't give a covenant not to sue over a counterfeit, because you are in real risk of being abandoned the mark, because you're dismissing it. Ginsburg Why? I know you said that in your brief, but if you give it — yeah, if you say the whole world can copy it, but this covenant would give it to only one manufacturer. Goldstein That's correct. Ginsburg So why would you abandon — why would giving a covenant to already amount to abandonment of your mark? Goldstein Okay. It is not a settled question in the law. There is no case that has considered this question. What a party claiming abandonment would say is that we would have licensed already then to increase its production and its distribution. But even if one didn't agree with that, Justice Ginsburg, my point would be this, and that is you can't continually evade an attempt to invalidate your mark, because certainly would agree — we'd agree that if you give a second one of these things out or the third one, you would be abandoning the mark. I have some actual facts for you about this, and that's — Breyer What is it? Because I'd like to know. I mean, I assume you ask them, do you have any current or future plan to produce a shoe that would violate our mark or that might, which is not, look at all, like the present — your present shoe and isn't even colorably like your present shoe? Do you have a plan to do such a thing? Are you in the process? Is it likely? And they say no. It's not like — that's the end of it? It's just as if they manufactured cell phones. But if they were to say, you know, we make new shoes all the time, and this is some kind of thing we might well consider, and we have people working on it, and they're considering whether to do it or not, it's well in the works, they win. Okay? What did they say? Page 173 of the Joint Appendix. They had every opportunity to describe exactly what you wanted to know about, Justice Breyer. We move to dismiss the case. Sotomayor, I'm making this as simple as I can. Okay. I'm a shoe manufacturer. I want to make new designs, and I want to be free to make the designs that I want. Yes. If this mark isn't validated, I intend to copy as much of it as I can. Sure. I don't have any records of doing the planning, because the trademark was there. Sure. But for sure, given my current shoe and the fact that they thought I imitated them, meaning you, you invalidate the mark, I'm going to copy as much of it as I can. Yes. Would that be enough? In your mind, you're saying you could do discovery then? Yes. And, Justice Sotomayor, of course. And the discovery is going to show what? Well, the President comes in and says exactly what I said. Right. They're going to win. They're going to win, Justice Sotomayor. And so for your vote, I am resting my entire case on the fact that you are understanding that this is what their affidavit suggests is just not right. Counsel, could you go back to Justice Breyer's question and answer that? Yes. So page 173, because there's a record here. You don't have to hypothesize. This was all on the table in the district court. We said they have no intention, no desire, no nothing to make something that is not unambiguously covered by the covenant. And Justice Ginsburg did point out in passing that if they had said something to the contrary, we would have modified the covenant. So here's what they said. And it would take a lot of your time for me to read all seven paragraphs on page 173, but they don't. Yes. You don't have to read to us. Okay. So these paragraphs do not say, they do not suggest, they do not imply, even between the lines, an intention to make something that is outside the covenant. They just don't. And that's really what they say. What they say is that they change this at the rate of a mile a minute. You know, they have stuff they put out, and we have the yums and the sweet whatever it is and the jelly beans and so forth, and we keep changing them. And so I don't know. I mean, it doesn't seem clear one way or the other. If it isn't, if I come to that conclusion, is it the case, I thought perhaps in looking at this, that the line I quoted, remember, which puts a lot of burden on you from Friends of the Earth, is not quoted in the district court, not quoted in the court of appeals. So perhaps the thing to do, I think the SG wants something like it. So you say, okay, this is the standard. It's tough for Nike to show this. You seem to have conducted this case without that standard quite in mind. It's tough for Nike, but they can do it, you know, depending on the facts. And you have these protective orders, da, da, da. So send it back, use the right standard, and give Nike a chance and give them a chance. And that way we, what about that? Well, I'd like to know what the answer to that question is, if you're a viewer. Do you want me to? Answer Justice Breyer's question. All right. Justice Breyer, so you've got a choice. You could let us win now or you could say, well, maybe you'll win on remand. Well, that's good. That's your opinion, that you will win on remand. Okay. All right. And, Justice Breyer, I have two answers. Number one is going to be, the first one is going to be about the facts of the case and the second is just going to be jurisprudential. The first one is, what more could one imagine in such an opinion that you would ask Nike to do on remand? I'd ask Nike, I suppose Nike could say, you know, I read the page of 73 and you changed things at the rate of a mile a minute and we look at Yum's and Belly Bean and they're sort of like our shoe, but we didn't think enough, but you did think enough, and are some of these changes that could happen at a mile a minute? Is there any reason to think, you know, that they won't look really colorably even like what you just did, but nonetheless, there's a pretty good point that they might infringe our present trade law? Justice Breyer. That's a long question. I don't know if they'll get a good answer. Well, I hope you will get a good answer. My point is this, Justice Breyer, what you've just said on remand, we would do is ask a question. We wouldn't try and prove anything. My point is this. Already has told the district court, the court of appeals, and this Court, everything that it wants to say about its intentions. It has had every opportunity in every court to have its lawyers simply say, Justice Sotomayor, this is not an accident. The reason they are not saying that they want to make a covenant of the — a copy of the Air Force One is that they don't want to make a copy of the Air Force One. There is no reason in the world to send this back to give — ask already again the question that has been asked in three separate courts. I said I had a jurisprudential answer to you as well, and that is, the case was presented to you as presenting a question of law, and that is, can you have a covenant not to sue that will end a case like this? And if you tell the lower courts, we don't know, you are doing, I think, not as much of a service to the development of law as you could. It is a much more sound approach, we think, to say already have the chance to build a direction. Ginsburg. Mr. Goldstein, can you inform us of when this practice of the unilateral covenant in order to move a cancellation claim, when — how long has it been around? It is still — it has been around for at least 20 years. It is still not very common for the very important reason that trademark owners know that if they hand these things out, they are at risk of having their mark invalidated. And second, they know that it doesn't avoid a determination of the validity of the mark, because a party like already can always go to the Federal agency, the TTAB. So I said I had some actual facts, and the facts are these. Although Nike has a broad trademark portfolio, it has only once in its history issued a covenant not to sue. It is in this case. That's because it usually sues. Page 114 of the Joint Appendix says, Your Honor, over the past 8 months, Nike has cleared out the worst offending infringers, and now already remains as one of the last few companies that was identified on that top 10 list of infringers. I mean, that's your company's policy. That's your attorney. I take it. Justice Kennedy, we do enforce our trademarks. You say we usually sue. I will tell you that we have filed six trade dress actions in the company's history. Now, you had said, because I think it's the other side's — the impression the other side has given, that we are getting a special advantage over them. I think it's really important to recognize for purposes of standing doctrine and mootness doctrine that of all the shoe manufacturers in the country, the one that is least likely to be injured by this trademark. There is only one, and it is already, because they are the only company in the entire world that has a promise that's substantial not to be sued under this trademark. We are the one — they are the ones that are least likely to come into conflict with Nike. Now, they can't. Kennedy, but that's because you gave them the covenant after you sued them. Yes, that's right. But we did give them the covenant. That's my point. After the covenant — we didn't nearly withdraw the case. I have one other piece of fact. Scalia, what's the consideration? I don't use the word contract at all. Yes. This is, you know, you can just give a covenant like that? Yes. We are judicially estopped. It's not a contract. We are estopped, and they have — the district court acted in reliance on it, construed it, and so we are bound by it. It's not a contract. I did have one other fact for you, because the other side has given you this impression that once bitten, twice shy, that if you are sued once for a trademark, they have a special fear that they are in the crosshairs, that we are watching everything that they do. So when they made this argument in the— They are on the top ten list of infringers. They are on the top ten list of infringers. But after that, after that, they and they alone got a covenant not to be sued under the — they are in a specially protected position, not a specially disadvantaged position. I did, however, when they made this argument in the reply brief, try to figure out if that's true. Is it actually the case that a person who's sued once has a legitimate worry that they will actually be sued again, so that you should lower the mootness or standing bar still further? So we looked at every single trademark action between 2000, January 1, 2000, and December 31, 2004, all of them. There were 593. And over the next 8 years, we tried to figure out how many times did the plaintiff sue the defendant again. It happened six times. So one— Breyer, I see that. I thought your response to Justice Kennedy was a different one. I liked it, which was that the concern that Nike can go and find out the competitor's plans is true, but it exists whenever a manufacturer brings a trademark infringement case, because that manufacturer has to show he is now making the product, or if not, he intends to. And if it's a question of intends to, then the defendant can go and look and see if that's true. And your response, I took it to that, was there are procedures that deal with that. They are called protective orders. And so is that the — have I got that right, what your argument is? You could not be more right. That's what your argument is, yes. It's also the truth that it is what happens in every single patent and trademark invalidity case. If you believe that gives rise to Article III injury, then every party has standing to challenge every competitor's— Ginsburg. Mr. Goldstein, what about Federal Rule 41a2? It says, if a defendant has pleaded a counterclaim, and you have recognized that there was Article III jurisdiction over that counterclaim, the case may be dismissed on the plaintiff's request over the defendant's objection only if the counterclaim can remain pending for independent adjudication. So on the face of it, it seems that that rule fits this case to a T, that is, the plaintiff wants the case withdrawn, defendant objects, and the question is, can the counterclaim remain pending for independent adjudication? Yes. I think the reason they did not pursue their Rule 41 argument in this Court and abandon it is that it's completely understood that if the party that's instituting the claim says, I'm not going to pursue my case at all, there simply is no Article III jurisdiction. And so even without a Rule 41 dismissal, there is no case or controversy remaining in the case. The district court, the court of appeals might also have said, and it dealt with this issue on 8a and 9a of the petition appendix, that they actually acceded to the dismissal of our claims. They're happy to have our claims gone. And you can't say we'll take the dismissal of the plaintiff's claim, but want to have the counterclaim remaining. Kennedy, you referred just in a fleeting way to the fact that they can go to the PTO and to the board. What about my question on, and it wasn't, it was probably my fault, I didn't quite understand the government's position. Is the standing burden any less after there is an administrative adjudication and you go to court for judicial review? The Chief Justice has suggested an argument that could be made. It is an argument that we disagree with. We've looked at the cases. We think that it's a point in their favor, Justice Kennedy, that while you can go to the TTAB, they wouldn't be able to appeal to an Article III court. I think that's a point in their favor. A point in our favor, however, is this notion of scarecrow trademarks hanging out there on the fields is inaccurate because of the ability to go to the TTAB in the first instance, they're experts. And second, remember what I said to Justice Sotomayor. Anybody in this market can say we want to counterfeit the Air Force One. We just want to make a copy of it. It's not complicated. And they will have the right to bring a claim to invalidate the mark. So we can't leave the trademark hanging out there. I had kept trying to come back, and if I could in my remaining time, to the understanding of the lower courts about the record, because I said, Justice Breyer, I think it would be much better for you to resolve the case because they had the opportunity to build a record, the case came to you on two courts' understanding of the record. And so if I could take you back to 14a and 15a of the Petition Appendix. Ginsburg, may I interject with just one thing that I would like you to clarify? Justice Breyer started out by saying the standard comes from Friends of the Earth. Do you agree, because as I recall, your brief doesn't even cite Friends of the Earth? That's not correct, Justice Ginsburg. So we do disagree, because of the Court's decision in Deakins, that this is a voluntary cessation case, but we accept for present purposes, so you don't think I'm fighting the hypothetical. Assuming that voluntary cessation principles apply, here's how they apply. When you not just dismiss the case, but you grant the covenant not to sue, and the you're doing now, or anything that I can imagine you doing in the future, because you haven't told me anything else, then you have ensured that the controversy can't arise again, and you've met the voluntary cessation doctrine. If, on the other hand, the other side comes forward with a declaration from an officer, some other form of proof that says, no, I'm worried I might do something outside the covenant, I definitely want to make a counterfeit, then the case is going to go on. But this case is not that hypothetical case. On 14a, the first full paragraph, seven lines from the bottom, Given the similarity of Yum's designs to the 905 mark and the breadth of the covenant, it is hard to imagine a scenario that would potentially infringe the 905 mark and yet not fall under the covenant. Yum's has not asserted any intention to market any such shoe. And then in footnote 5 on 15a, Given the absence of record evidence that Yum's intends to make any arguably infringing shoe that is not unambiguously covered by the covenant, this hypothetical possibility does not create a definite and concrete dispute. That's how the case should be resolved. You should say, yes, there can be other cases where the covenant is too narrow. Yes, there can be other cases where someone does allege a desire to make a counterfeit. Those are different cases. But do not, I suggest to you, remand when the facts have already been developed in this case. If we lose on this record, we lose on this record. But if we win on this record, we win on it, because the record has been built in this case and it is settled. Sotomayor, you are saying that you've met, if we decide you bear the burden of proof, you're saying you could live with that. Yes. And your burden was met by their submissions. Our burden was met by our submission of the covenant, which dealt with every product they're making and every colorable imitation and the future of it. And when they didn't then come back and say, actually, we want to make something that might be outside the covenant, then it was, that's when we won the case. Thank you very much. Thank you, counsel. Mr. Dabney, you have four minutes remaining. Your Honor, the covenant, the affidavits in this case were prepared about five weeks after this completely unexpected development in the middle of a hard-pressed litigation was made, and the position that the petitioner made to the district court was, there is obviously subject matter jurisdiction here, not just because of the Rule 41 point, but that you can't say, well, we have a case that raises these three issues. You could say in a single judgment right now, the plaintiff's claims are waived because they've waived them, the trademark is invalid, and the registration was unlawfully issued and should be granted. Courts issue judgments on the basis of alternative holdings all the time. And the only reason why we're even talking about this is that Judge Sullivan bifurcated the proceedings so that we dealt with this one issue in isolation and then the other thing came up separately. So we said, we think there's a case right now, but if you doubt it, we request leave to amend our counterclaim to assert claims for invalid procurement of registration and other things that could have been asserted. So the state of the record reflects the suddenness with which the plaintiff most unexpectedly did what it now says in public it's never done before and dropped its claim so unexpectedly in the case. So there's no question but that if it turns out that it's not enough to say that we're actively engaged and we want to do all of the things any person in a normal position would want to do, and we have a concrete interest, the defendant can certainly allege more than what it has been alleged. The other thing is that the plaintiff's claim is unlawful, but the plaintiff's claim is unlawful. Sotomayor's claim is unlawful, but the plaintiff's claim is unlawful, but the plaintiff's claim is unlawful. And you are going to imitate it, and you haven't been willing to do that. Monahan. Your Honor, the Petitioner has been trying now for two and a half years to establish its right to do that. It was not our understanding that, under the law as it stood, that the — in addition to saying we have an enormous commercial interest in doing this and we are seeking the right to do this, since— What's your commercial interest? The commercial interest is to partake of this very large and lucrative business that the Respondent's evidence shows in this case. So are you willing to make the statement he's asked you for? You keep equivocating on the answer. I'm, you know, it's like I don't want to say it, is what you're telling us. I think it is — first of all, the Petitioner up until now has said what he said. I could stand here and say I believe that if the registration were canceled, it is highly likely that the Petitioner would bring out a yum. So, look, how are you hurt, then? Because suppose he wins here. Now, you, if you have the president of the company, say, hey, I'm going to do it, exact copy. Go bring in a cancellation action. If he can't quite say that, you know, you can start one. You can't quite say that, but he says something sort of vague about it that's close, go to the PTO. And if he can't say anything like that at all, well, then maybe you should lose. I mean, that's a — what's the practical problem with that? The practical problem here is that in the procedural posture of this case, which is analogous to a summary judgment situation, all inferences, all reasonable inferences need to be drawn in favor of the nonmoving party. The suggestion that we had the opportunity to develop the record is completely incorrect. There wasn't even oral argument on this motion. The district court never gave us any opportunity to put in evidence other than to come in and say we have what we believe is a basis for jurisdiction now. Rule 41a2 precludes you from dismissing our counterclaim. But if you think what we've alleged now is not enough, we request leave to amend our pleading. So to force us to start all over again in a new suit is — would be fundamentally unfair to the Petitioner. And what we're seeking here is simply judicial review. We're seeking the — the ability to obtain extinguishment not just of the particular claims that this plaintiff saw fit to waive, but the much broader government-registered  Thank you, counsel. The case is submitted.